IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

BEAUMONT DIVISION

| | | |
|---|---|---|
| KERRON L. OTIS | § | |
| VS. | § | CIVIL ACTION NO. 1:23-CV-75 |
| DIRECTOR, TDCJ-CID | § | |

REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

    Petitioner Kerron L. Otis, a prisoner currently confined at the Clements Unit of the Texas Department of Criminal Justice, Correctional Institutions Division, proceeding *pro se*, filed this Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.

    The Petition was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636 for findings of fact, conclusions of law, and recommendations for the disposition of the case.

Factual Background

    Petitioner is in custody pursuant to a judgment entered in the First Judicial District Court of Jefferson County, Texas. Petitioner was charged with capital murder, but the State did not seek the death penalty. At trial, Petitioner raised the affirmative defense of insanity. A jury rejected Petitioner's insanity defense and found him guilty of capital murder. Because the State did not seek the death penalty, Petitioner was sentenced to life imprisonment.

    Petitioner appealed the final judgment, arguing that the evidence was insufficient to support the jury's finding that Petitioner was not insane at the time of the offense and that the trial court erred

by admitting Petitioner's written statement into evidence. The Ninth Court of Appeals summarized the evidence as follows:

> Frederick Arnold drove a white Chrysler New Yorker to go fishing in a canal beside the church he attended off Highway 73 in Port Acres. After he did not return home that evening, his son searched for him at New Covenant Church, and found him lying face down by the canal with a gunshot wound to his head. Arnold died from the injury.
>
> On the day of Arnold's death, two brothers working at an adjacent church noticed a suspiciously-parked white vehicle. One of the brothers approached the vehicle. He noticed a man wearing a black-knit cap in the car with his head down like he was going through something. The driver made eye contact, then backed out at a normal rate of speed and drove west on Highway 73. The brothers reported the suspicious vehicle to the police.
>
> Around one o'clock that afternoon, an officer was dispatched to the Jesus Tabernacle Church to investigate the report. He did not locate the vehicle there, but soon saw the vehicle locked and parked no more than 200 yards from the New Covenant Church. Around the same time, a postal worker delivering mail in the vicinity of the New Covenant Church pulled off the road to avoid a white car that was driving so fast it went airborne. The car was coming from the general direction of Highway 73 towards where the road ended at 59th Street. As the car passed, she noticed that the driver appeared to be the only one in the vehicle. She did not see which way the car turned onto 59th Street. On the news the next day, she noted reports of an attempt to locate a vehicle in connection with a murder; the vehicle matched the description of the white car that sped past her the day before. She reported what had happened to the police.
>
> A man who lived on 59th Street was in his yard on the day of the murder. Sometime before 3:30 that afternoon, he saw a man driving a white vehicle at a high rate of speed down 59th towards where 59th Street dead ends into a canal. That night on the news he heard the police were attempting to locate a vehicle in connection with a murder at New Covenant Church. He wrote down the reported license plate number. The next day, a neighbor asked him if he knew anything about the vehicle parked in the dead end of 59th Street by the canal. The vehicle was in a secluded spot-parked off the street and screened by bushes. The vehicle was the same vehicle that had sped past the day before. The license plate matched the description broadcast on the news. The car was later identified as Arnold's vehicle. Fingerprints from the vehicle were retrieved but none of the prints matched any of the four suspects, which included appellant, or anyone in law enforcement's database. The police retrieved a plastic wrapper and a black-knit cap found near the vehicle.

An investigation revealed that the suspiciously-parked vehicle reported by the brothers at the adjacent church had been purchased by appellant from Roman Auto Sales in Port Arthur prior to Arnold's death. Police attempted to talk to appellant. He became angry and refused to speak to the police.

Almost a year after Arnold's death, Detective James Underhill received information that appellant wanted to talk with him about a homicide. Detective Underhill took appellant's statement. Appellant stated he bought a white Oldsmobile from Roman Auto on Gulfway Drive prior to Arnold's death. He left home with "a .22 revolver black with wood grips and a .25 automatic black." He retrieved property out of his house to sell for drugs. He gave a man a stereo system and speakers in exchange for crack and an old single shot 12 gauge shotgun with a sawed-off barrel and gold shotgun shells. He said he met two "Musl[i]m brothers" at the mosque in Port Arthur and together they decided "to kill some Christians." They rode down Highway 73. They saw a 4-door white car out in front of the church, and stopped and parked across the highway from the church. They saw a man fishing on the side of the church and walked towards him. The man fishing was "about in his fifties" and was wearing jeans and "maybe a striped shirt." One of the Muslim men pulled out the shotgun and ordered the man to the ground while the other Muslim man got the man's wallet and keys. The man with the shotgun shot the fisherman while appellant was "probably 30 feet away." Appellant said the two Muslim men got into the victim's car and appellant went to his car. Appellant followed the Muslim men as they drove the victim's car "kind of fast" down a dead-end street. The men then turned left, parked, and abandoned the vehicle. They told appellant they threw the shotgun, the wallet, and appellant's backpack in the water and that his other gun was in the grass. According to appellant, the Muslim men left town.

Two days later, appellant recanted the statement in a letter to the Port Arthur Police Department. The letter explained that he admitted to the murder which he did not commit because he thought he would get the death penalty and he wanted to die.

D.P.S. divers recovered a sawed-off 12-gauge shotgun and a gold 12-gauge shell from the canal at the end of 59th Street. Arnold's keys were also found in the canal. Law enforcement interviewed the imam at the Port Arthur mosque, and he could not confirm the existence of the two "Muslim brothers."

At trial, appellant testified that the written statement contained lies. He bought the shotgun two or three weeks prior to the murder. On the day of the murder he was hearing voices and the voices were telling him to eat rat poison. He went to the store, bought rat poison, and ate it because the voices told him that he would die and then "come back" as Lucifer and have more powers. He was wearing a black knit cap. He parked by the blue church and then he saw a vision of his mother at the "Covenant Church" and she was standing by Frederick Arnold. The voices told him that Arnold

3

> was trying to keep him from ruling the world and that he needed to kill Arnold. He drove down Highway 73 and started hearing screams so he got out of the car and grabbed a gun out of his trunk and started running down the street. He was mad because he was tired of hearing voices.
>
> Arnold was fishing and turned around. Arnold asked appellant how he was doing and appellant heard a voice say, "free him." Appellant pulled out his gun. Arnold begged appellant not to hurt him. Arnold took his wallet out of his pocket and threw it and his keys on the ground. Appellant ordered Arnold to get down, and then shot him. He took Arnold's wallet, keys, and vehicle. He drove away fast in Arnold's vehicle down to the end of 59th Street and threw everything in the canal.

*Otis v. State*, No. 09-09-00140-CR, 2010 WL 1794932, at *1–3 (Tex. App.–Beaumont May 5, 2010, no pet.). The Ninth Court of Appeals overruled both of Petitioner's issues for appeal, and affirmed the judgment on May 5, 2010. Petitioner did not file a petition for discretionary review.

Petitioner filed three state applications for habeas relief pursuant to Texas Code of Criminal Procedure 11.07. Petitioner's first state application was filed on July 28, 2009. The application was dismissed on August 26, 2009, because Petitioner's direct appeal was pending. Petitioner filed his second state application on April 26, 2018. The Texas Court of Criminal Appeals denied the application without written order on September 12, 2018. Petitioner's third state application was filed on June 30, 2022, and it was dismissed as a successive application on August 31, 2022.

## The Petition

Petitioner filed this petition for writ of habeas corpus on February 10, 2023. Petitioner claims he was denied due process when his case was presented to the grand jury at a time when the State knew Petitioner was incompetent to stand trial. Petitioner alleges the prosecutor committed misconduct by seeking an indictment when Petitioner was incompetent, using a forged document, and withholding exculpatory evidence. Petitioner alleges the indictment was invalid because there was no evidence to support it. Petitioner contends he received ineffective assistance of counsel

because his trial attorney: (1) refused to investigate, (2) failed to discover evidence, (3) failed to file motions, (4) raised an insanity defense instead of presenting a defense based on Petitioner's innocence, and (5) threatened an enhancement if Petitioner changed his plea. Finally, Petitioner claims that he is actually innocent of the offense.

Analysis

Title 28 U.S.C. § 2254 authorizes the district court to entertain a petition for writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment if the prisoner is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). There is a one year statute of limitations on federal petitions for writ of habeas corpus brought by state prisoners. 28 U.S.C. § 2244(d). The limitation period begins to run from the latest of: (1) the date on which the judgment became final; (2) the date on which an impediment to filing created by unconstitutional state action was removed; (3) the date on which the United States Supreme Court initially recognized the constitutional right if the right is retroactively applicable to cases on collateral review; or (4) the date on which the factual predicate of the claim could have been discovered by due diligence. 28 U.S.C. § 2244(d)(1)(A)-(D). The amendment also provides that the statute of limitations is tolled while a state post-conviction review or other collateral attack is pending. 28 U.S.C. § 2244(d)(2).

Here, there was no impediment to filing caused by unconstitutional state action, and Petitioner does not rely on a newly-recognized constitutional right. Petitioner makes a conclusory allegation that there was newly-discovered evidence of his innocence. Although it is unclear what evidence Petitioner is referencing, it is clear that the evidence was not newly-discovered; it was evidence that was contained in his attorney's files. (Doc. #21 at 8.)

In this case, the statute of limitations began to run when the judgment became final. Because Petitioner did not file a petition for discretionary review within thirty days after the intermediate appellate court affirmed the judgment, his conviction became final on June 4, 2010. TEX. R. APP. P. 68.2(a). The statute of limitations began to run the next day, and it expired on Monday, June 6, 2011. Petitioner's first state application for habeas relief did not toll the statute of limitations because it was filed, and dismissed, while his direct appeal was still pending. Petitioner second and third state applications did not toll the statute of limitations because they were filed long after the limitations period had expired. As a result, this petition for writ of habeas corpus, filed more than eleven years after the statute of limitations expired, is untimely.

The statute of limitations may be equitably tolled in appropriate cases. *Holland v. Florida*, 560 U.S. 631, 130 S. Ct. 2549, 2562 (2010). Equitable tolling is only available if: (1) the petitioner diligently pursued his rights, and (2) extraordinary circumstances prevented timely filing. *Id*. Delays of the petitioner's own making are not "extraordinary circumstances." *Sutton v. Cain*, 722 F.3d 312, 316 (5th Cir. 2013). Excusable neglect and ignorance of the law do not justify equitable tolling. *Id*.

Petitioner contends that he was unable to file a timely petition because he suffers from a mental illness and has experienced periods of time when he was not competent to pursue his legal claims. In some cases, mental incompetency might support equitable tolling. *Fisher v. Johnson*, 174 F.3d 710, 715 (1999) (holding that equity did not require tolling where a period of mental incompetency occurred six months before the filing deadline and petitioner did not show that he diligently pursued habeas relief during the remainder of the time). However, in this case, Petitioner is not entitled to equitable tolling because he has not shown that he was mentally incompetent since the conclusion of his direct appeal, or that his periods of incompetency precluded him from filing

6

a timely federal petition. Petitioner also failed to demonstrate a causal connection between a mental illness and his failure to file a timely petition. *See United States v. Valles*, No. 19-50343, 2023 WL 248889, at *2 (5th Cir. Jan. 18, 2023) (holding that the petitioner's conclusory allegations of a nervous breakdown, without showing how the condition affected the petitioner's ability to file a timely petition, is insufficient to warrant equitable tolling); *Jones v. Stephens*, 541 F. App'x 499, 505 (5th Cir. 2013) (holding that mental illness may warrant equitable tolling if the petitioner was incompetent and the incompetence affected the petitioner's ability to timely file a habeas petition). Petitioner mentions he had a "mental breakdown" in 2022, but the statute of limitations expired long before then.

In this case, Petitioner has not demonstrated that he diligently pursued his rights, or that extraordinary circumstances prevented him from filing a timely petition. As a result, he is not entitled to equitable tolling of the statute of limitations.

Finally, Petitioner contends that he is actually innocent of the offense of capital murder. Actual innocence, if proved, may excuse a procedural bar to federal habeas review of constitutional claims. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). To pass through the actual innocence gateway, Petitioner must show that, in light of new, reliable evidence, no fact-finder would have found him guilty beyond a reasonable doubt. *Id*. Petitioner failed to meet this standard because he did not present any newly-discovered evidence that would have resulted in his acquittal.

## Recommendation

This Petition for Writ of Habeas Corpus should be dismissed.

Objections

Within fourteen days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings of facts, conclusions of law and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C).

Failure to file written objections to the proposed findings of facts, conclusions of law and recommendations contained within this report within fourteen days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings, conclusions and recommendations and from appellate review of factual findings and legal conclusions accepted by the district court except on grounds of plain error. *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72.

**SIGNED this the 18th day of December, 2023.**

_____
Christine L Stetson
UNITED STATES MAGISTRATE JUDGE